UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES, ex rel Erik Sargent, | ) | |
| ERIK K. SARGENT, | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| DENIS R. McDONOUGH, Secretary | ) | |
| DEPARTMENT OF VETERANS AFFAIRS, | ) | |
| | ) | |
| TRACYE DAVIS, | ) | |
| | ) | |
| TODD STAPLEY, | ) | |
| Defendants | ) | |

## <u>INTRODUCTION</u>

1. This is a civil claim for relief from retaliatory actions and conspiracy pursuant to 31 U.S.C. §3729(a)(C) and §3730(h) and whistleblower protection pursuant to 5 U.S.C §2302(b)(8) and (9).

2. Relator/Plaintiff (hereinafter plaintiff) was retaliated against in violation of the False Claim Act and Whistleblower Protection Act because he refused to approve a fraudulent waiver of an overtime cap for employee BF, and otherwise engaged in protected activity.

3. When plaintiff refused to authorize overriding a cap and to falsely state BF's claims should be coded as COVID-related, and when he disclosed what he reasonably believed was a violation of the law, gross mismanagement of funds and abuse of authority to the VA Office of Inspector General, defendants targeted him with a campaign of harassment and discrimination.

4.  Defendants Davis and Stapley, acting outside the scope of their employment and in conspiracy with the American Federation of Government Employees, knowingly made and approved a false claim for waiving the overtime cap for claims totaling more than $95,000, lied about it, and abused the Administrative Investigation Board (AIB) process to lay blame on the plaintiff and deflect attention of federal regulators from the fiscal chaos created on their watch.

5.  On October 20, 2021, Stapley told plaintiff that BF's claims for payment of approximately $95,000 were "criminal" and that "the OIG needs to investigate" but instead of referring the matter to the Office of Inspector General at that time, defendants cut a secret deal with the union to pay BF and orchestrate an AIB to discipline plaintiff for "insufficient oversight of premium pay management and verification of completed work," have him sign off on the criminal claims for $95,000, and call it good.

6.  On November 10, 2021, plaintiff was notified of the AIB and later that day told to "put in a fiscal ticket to get the overtime cap overridden" for BF. He refused because defendants had told him they had unassailable proof that BF's claims were "criminal" and the only way to override the cap was to code the claims COVID-related, which they were not.

7.  Defendants Davis and Stapley, acting outside the scope of their employment, knowingly made and presented for approval a false record or statement material to a false or fraudulent claim in December 2021 when they executed a waiver approving payment above the overtime cap for employee BF in the approximate amount of $95,000.

8.  Defendants' discovery of BF's fraud was the opening of Pandora's Box and they wanted it shut. VA Maine's management of overtime and COVID spending was rife with holes. Millions of dollars of premium overtime and COVID relief funds were comingled, largely

unaccountable, and mismanaged -- and plaintiff was scapegoated and punished for doing the right thing.

9. VA Maine did not adhere to national standards, policies and procedures for tracking or overseeing time and leave, did not properly account for COVID relief funds, and grossly mismanaged Community Care. Meanwhile plaintiff worked several critical jobs within the VA during the pandemic and cared for veterans with skill, integrity, and dedication.

10. Between 2020 and 2022 VA Maine spent a staggering $265,000,000 on Community Care and millions of dollars on overtime without proper guardrails or oversight, including $95,000 ultimately paid to BF.

11. Defendants rearranged the furniture metaphorically speaking with the AIB to cover up the BF mess and throw a blanket over the heaps of questionable overtime piled up in the corners. Stapley said to plaintiff, "sorry it's got to be you." They did a similar thing with the Mental Health department -- designed an AIB with surgical precision to cut out certain employees when the legitimate union grievance or HR process would not do.

12. Davis and Stapley knew if their agreement with the union to pay BF's false claims was made known to regulators or officials at the VHA, it could expose the broader mismanagement at VA Maine.

13. Adverse action against plaintiff by defendants in their official capacity includes threats and intimidation, unwarranted investigation, altering his personnel records, changing his job description, changing his chain of command, substantially reducing his responsibility and the number of employees under his supervision, interfering with his job, and taking away important duties he performed well.

14.     Damages include fear, anxiety, public embarrassment, pain and suffering, loss of enjoyment of life, injury to professional reputation, and legal fees and expenses.

## PARTIES AND PERSONS OF INTEREST

15.     At all relevant times relator/plaintiff was a GS-14 Health Systems Specialist in the Veterans Health Administration (VHA) and Manager/Director of the Sensory and Physical Rehabilitation Service Line at VA Maine Healthcare System who supervises approximately 40 employees. He also performs the functions of a Service Line Lead for the Veterans Integrated Services Network 1 (VISN 1).

16.     The Sensory and Physical Rehabilitation Service Line that plaintiff manages[1] consist of 5 Time and Leave Units that include employees not under his supervision, like BF until September 26, 2021, when she was realigned for reasons unrelated to this case.

17.     Plaintiff has been in the same position since 2011 and a federal employee since 1998.

18.     At all relevant times plaintiff performed the duties of his job(s) satisfactorily.

19. Defendant Denis McDonough is the United States Secretary for Veterans Affairs and sued in his official capacity.

20. The Veterans Health Administration (VHA) is an agency of the U.S. Department of Veterans Affairs.

21. VA Maine Healthcare (VA Maine) is the local VHA organization.

22. Tracye Davis is the Medical Center Director of VA Maine.

23. Todd Stapley is the Chief of Staff at VA Maine.

---

[1] aka "Fund Control Point 711" or "FCP 711."

24. BF is a family nurse practitioner who worked at relevant times for the VA Maine in the Spinal Cord Injury Clinic under supervision of Susan Hage, and did Community Care consults for Sensory and Physical Rehabilitation for plaintiff as necessary.

25. Susan Hage was BF's supervisor but did not oversee or certify BF's time for work performing or her overtime.

26. At relevant times in 2020 through September 26, 2021, BF was assigned to plaintiff's service line, meaning he certified and approved her time and leave including overtime according to the VA Maine system.

27.  Kristine Lucas is the Chief of Audiology at VA Maine Healthcare. Audiology is in the Sensory and Physical Rehabilitation service line. When plaintiff was away from work, in his absence Lucas served in the role of certifying and approving time and leave for employees in the Sensory and Physical Rehabilitation service line including BF and gave testimony to the AIB, among others.

28. At relevant times plaintiff and Lucas were the only Time and Leave Unit supervisors and overtime approving officials for the Sensory and Physical Rehabilitation service line. This was the way defendants at VA Maine set up the system despite it being out of sync with national standards.

29. Mitchell Parish was a TCF (i.e., intern) who worked at the VA Maine Healthcare Compliance and Integrity office in 2021.

30. Joel Murphy at all relevant times was the Administrative Officer to Stapley.

31. The American Federation of Government Employees 2011 ("the union") was at relevant times the union of which BF was a member.

## DISCLOSURE OF SUBSTANTIALLY ALL MATERIAL EVIDENCE
### 31 U.S.C. §3730(b)(2)

32. The following exhibits contain relevant facts, the identity of witnesses, and evidence that are hereby incorporated in plaintiff's complaint by reference:

33. The false claim by Davis and Stapley in violation of 31 U.S.C.S §3729 and §3802 is attached as **Exhibit A**.

34. Plaintiff's work experience, qualifications, duties, and responsibilities are described more fully in the resume attached as **Exhibit B**.

35. **Exhibit C** – Exception to Biweekly Pay Limitation Memo dated March 4, 2020

36. **Exhibit D** – Delegation of Authority Memo dated August 9, 2021

37. **Exhibit E** – Delegation of Authority memo dated June 22, 2021

38. **Exhibit F** – Delegation of Authority Memo dated August 9, 2021

39. **Exhibit G** – Notice of BF's realignment from plaintiff's service line dated August 27th effective September 26, 2021

40. **Exhibit H** – Series of text message conversations between plaintiff and Stapley, including a September 27, 2021, exchange about BF's overtime.

41. **Exhibit I** – October 19, 2021, email to plaintiff from Integrity and Compliance Officer Mitchell Parrish regarding an alleged time/overtime documentation incident.

42. **Exhibit J** – Text message exchange dated 10/19/21 between Mitchell Parrish and plaintiff arranging meetings on those dates to discuss BF's overtime, and a statement plaintiff provided following the meeting. During the meeting Parrish showed plaintiff his computer screen that displayed a spreadsheet with multiple tabs showing his voluminous work investigating BF's overtime, productivity, and consults.

43. **Exhibit J-1** – Emails dated October 20 and 21, 2022 between plaintiff and Mitchell Parrish with referenced statement by plaintiff.

44. **Exhibit K** – Stapley's calendar for October 25 – 29, 2021 showing "AIB chat" with Joel Murphy on 10/26/21 and "AIB Discussion" with Davis on 10/28/21.

45. **Exhibit L** – Unsigned memo allegedly from Integrity and Compliance Officer to Stapley dated October 29, 2021, recommending an Administrative Investigation Board to investigate insufficient oversight.

46. **Exhibit M** – Stapley email dated November 1, 2021, regarding "Over time" sent on the heels of a morning report earlier that day by Davis that the OIG has arrived at VA Maine to review Community Care.

47. **Exhibit N** – Notification of Administrative Board of Investigation dated November 9, 2021, to plaintiff from Davis regarding "allegations of insufficient oversight or premium pay management and verification of completed work within the Sensory and Physical Rehabilitation Service Line during Fiscal Year 2021"

48. **Exhibit O** - November 10, 2021, text messages from Joel Murphy (Stapley's Administrative Officer) to plaintiff requesting among other things to "chat" at 2:28 pm

49. **Exhibit P** – Testimony of Kristine Lucas on December 13, 2021 to the AIB wherein she describes time and leave policies and practices at VA Maine, including (1) on page 7 that during the pandemic employees worked overtime in other services, (2) on page 12 that until June of 2021 she and plaintiff were the only TNL and approving officials in their service line, and (3) on page 11 that BF's direct supervisor was Susan Hage who did not oversee or certify BF's time for work performing. Before her testimony and off the record,

the AIB members told Lucas they were associates of Davis and knew her from other positions she held within the VHA.

50. **Exhibit Q** – Email dated December 17, 2021, from Ami Rezac to plaintiff advising against issuing "standard work product" discipline of recreation therapists as directed by Stapley since it was unjustified and had the appearance of retaliation.

51. **Exhibit R** – Testimony of Erik Sargent dated January 11, 2021 (sic) wherein (1) AIB Board in its examination of him describes in detail the overwhelming evidence of BF's fraud, and (2) plaintiff testified that Stapley told him BF had committed fraud.

52. **Exhibit S** – "Evidence File" – proving BF committed fraud, waste, and abuse. Upon information and belief, defendants have not implemented any of the AIB's recommendations except disciplining plaintiff.

53. **Exhibit T** – Email exchange dated February 10, 2022, between Stapley and plaintiff about overtime of Charity Brann

54. **Exhibit U** – Email dated February 11, 2022, from plaintiff to AIB Board enclosing a memorandum to supplement his testimony to include Stapley's assurances BF would be investigated by the OIG, that on information and belief she was not.

55. **Exhibit V** – Email dated February 25, 2022, from Stapley to plaintiff containing inaccurate description of a meeting they had because among other things it fails to mention the discussion of BF and that she was paid for her fraudulent overtime.

56. **Exhibit W** – Plaintiff's report to the VA Inspector General dated March 4, 2022

57. **Exhibit X** – Reprimand dated March 9, 2022

58. **Exhibit Y** – Plaintiff's response to reprimand dated March 18, 2022

59. **Exhibit Z** – Department of Veterans Affairs OIG letter dated March 28, 2022

60. **Exhibit AA**- Stapley's reply to plaintiff's response to reprimand dated March 24, 2022

61. **Exhibit BB**- Plaintiff's appeal of reprimand dated April 22, 2022

62. **Exhibit CC** – Defendants' Response to Formal Grievance

63. **Exhibit DD** – VA Maine organizational chart as of May 5, 2022

64. **Exhibit EE** – VA Maine's organizational chart as of May 10, 2022, showing plaintiff's "demotion."

65. **Exhibit FF** – Email from Stapley dated May 31, 2022 – Copy of Premium Pay Report FY22

66. **Exhibit GG** – Email dated September 23, 2022, from Lori Lamb to plaintiff regarding request from BF

67. **Exhibit HH** – 14 email messages from BF allegedly reporting overtime between July 27, 2021, and August 17, 2021

68. **Exhibit II** – 14 email messages from VA Maine Chief Financial Officer regarding overtime and use of COVID funds showing the chaos resulting from VA Maine not using the dashboard system to track COVID related time and that plaintiff's service line was not the problem.

69. **Exhibit JJ** – Community Care data showing VA Maine spent $264,054,022 on outpatient referrals in FY 20, 21 and 22

70. **Exhibit KK**- Plaintiff's Position Risk and Sensitivity Level Designation "Moderate" as a Health Systems Specialist

71. **Exhibit LL** – Plaintiff's Plan Profile created on 4/15/21.

72. **Exhibit MM** – Plaintiff's Plan Profile created on 3/8/22 by Stapley that changes his position tile to "Chief/Director HLTH SYS SPECX/REG HR"

73. **Exhibit NN** – Email to plaintiff from VISN Chief of Personnel Security informing him of an investigation on account of his position being "high risk."

74. **Exhibit OO** – Pages 1, 44, 45, 46 of 75-page OPM Investigation

75. **Exhibit PP** – Timeline of Kristine Lucas

76. **Exhibit QQ** – text messages between BF and plaintiff between August 18, 2021 and December 16, 2021.

77. **Exhibit RR** – Hage text message re BF

78. **Exhibit SS** – Union email about annual leave

79. **Exhibit TT** – BF email to Corey Vail re PT DOAs

80. The VA Maine Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees 2011.

81. A recording of a meeting between Stapley and plaintiff held on March 11, 2022, that will be produced in a manner acceptable to the court and defendants.

82. A recording of a meeting between Stapley and plaintiff held on March 28, 2022, that will be produced in a manner acceptable to the court and defendants.

## MATERIAL FACTS AND INFORMATION

83. During the COVID pandemic, plaintiff was responsible for managing 7715 physical therapy consults to Community Care among his numerous other duties and responsibilities.

84. The VA launched its Community Care Program in 2019 to implement portions of the 2018 Mission Act that established new criteria for Vets getting healthcare outside the VA. A consult in the private sector is required under certain circumstances when care at a local VA facility is not timely possible.

85. In fiscal years 2020 – 2022, VA Maine paid over $260 million for outpatient Community Care - a staggering amount – and evidence of failure by the facility to perform its essential functions, according to VA standards.

86. BF was qualified to perform the Community Care physical therapy consults for the Sensory and Physical Rehabilitation Service as a certified nurse practitioner, having an NP was in the best interests of the veterans, and she was the only person able and willing to do the job.

87. By delegation of authority and consistent with the VHA Handbook 5011/35 and the VA Maine Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees 2011 Master Agreement, plaintiff offered to BF the task of physical therapy Community Care consults as overtime.

88. Regularly – and especially during COVID - employees of VA Maine are assigned overtime by people who are not their supervisor unbeknownst to their supervisor.

89. BF's overtime processing delegation of authority on Community Care PT consults was not "mission critical" in support of an emergency state or natural disaster such as the COVID-19 public health emergency pursuant to the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) that authorizes pay limitation waivers for employees performing such work.

90. It was plaintiff's reasonable expectation that BF would complete the Community Care consults and collect overtime compensation according to law. He sufficiently monitored BF's work consistent with VA Maine policy by reviewing reports showing the number of consultations to Community Care providers that were completed and receiving emails from BF to timekeepers with the number of hours she claimed to work daily.

91. At no time did plaintiff have access to the data collected by defendants from BF's computer and elsewhere that proves BF's fraud. There was no reasonable basis on which he could have inferred criminal activity or known she was completing the consults during her regular hours.

92. The process BF used to get paid overtime was the same process other VA Maine employees used at VA Maine and involved sending the number of hours to the timekeeper and copying the approving official. The timekeeper would enter the hours into VATAS, the timekeeping system, and then an approving official (plaintiff or his designee) would approve it.

93. In August 2021, plaintiff learned about an issue related to BF's overtime. She had reached the cap for overtime for the year and could collect no more unless the overtime was COVID-related, which processing delegation of authority ("DOA") Community Care consults was not. Plaintiff relayed this information to BF and defendants. Plaintiff offered BF comp time and BF refused.

94. On September 26, 2021, BF was realigned out of plaintiff's service for reasons unrelated to this case.

95. On September 27, 2021, Stapley contacted plaintiff and told him the union was seeking authorization to pay BF's claims for overtime. Plaintiff told Stapley that BF "tapped out" and could not get anymore overtime. Plaintiff told Stapley the only way BF could get authorization to override the cap was if the work was COVID-related, which processing delegation of authority on Community Care consults was not, and that BF would have to wait until the next calendar year to work anymore overtime.

96. On September 29, 2021, plaintiff received a call from Stapley who was aggressive and upset about BF's overtime issue. Stapley had been dealing with the union and told plaintiff he "better have documentation" because some matter was heading to Labor Relations. Plaintiff felt threatened and explained again the rationale for assigning BF overtime to complete the required PT Community Care consults until a system for adhering to the Mission Act was streamlined and appropriate staff was in place, and that BF tapped out of overtime per the regulations. Plaintiff correctly told Stapley the union had no legitimate issue since he had complied fully with the agreement.

97. On October 19, 2021, plaintiff received an email from Mitchell Parrish about a compliance incident number INV.21.1267 related to overtime documentation he was fact-finding and asked to meet. Plaintiff met with Parrish that afternoon and followed up with a written statement. Parrish told the plaintiff he would share a write-up of the conversation, but none was forthcoming.

98. On October 20, 2021, Parrish met with Kristine Lucas and told her he was investigating overtime claimed by BF.

99. On October 20, 2021, plaintiff had a meeting with Stapley and his Administrative Officer Joel Murphy that was also aggressive in approach. During the meeting Stapley told plaintiff (for the first time) that BF had not been logging on to her computer when she claimed to be doing the PT Community Care consults, that her activity was "criminal" and needed to be investigated by the Office of Inspector General, and that BF's fraudulent claims were in the amount of $98,000. Plaintiff was shocked and sickened. He said, "she lied to me then."

100.     On October 26, 2021, Stapley had a meeting with Joel Murphy to discuss an AIB.

101.     On October 28, 2021, Stapley had a meeting with Davis to discuss an AIB.

102.     On October 29, 2021, an unsigned memorandum from "Integrity & Compliance Officer, VA Maine Healthcare System" Mitchell Parrish to Stapley regarding Compliance Incident INV.21.1267 was created, stating among other things, "because there is a possibility of FWA, an Administrative Investigative Board (AIB) may provide more details regarding the FWA allegation."

103.     On November 1, 2021, during her Morning Report, Davis announced to the VA Maine executives on the call that the Office of Inspector General has arrived to review Community Care, adding that it was "not for cause." It was apparent to plaintiff that Davis was quite concerned about the OIG.

104.     Following the Morning Report on November 1, 2021, Stapley sent out a warning email to the service chiefs about excessive overtime and the cap.

105.     On November 9, 2021, Davis signed a memorandum authorizing an AIB to investigate "allegations of insufficient oversight of premium pay management and verification of completed work within Sensory and Physical Service Line during Fiscal Year 2021 by approving officials."

106.     The AIB was not charged with investigating BF's alleged fraud. It was given access to the evidence thereof by defendants that was used to question plaintiff and other witnesses and bolster the final report about plaintiff's alleged insufficient oversight.

107.     On November 9, 2021, Stapley contacted plaintiff about an incident involving a student gaining access to a locked Med Box that ultimately led to the discipline of the students' supervisor, who was a physical therapist. When Stapley spoke to the PT about

the Med Box incident, he strayed from that topic and asked inappropriate, irrelevant, probing questions that appeared to be an attempt to collect "dirt" on the plaintiff.

108.     On November 10, 2021, plaintiff was notified of the AIB. He later learned from Lucas the AIB panel members chosen by Davis were friendly associates of hers from previous positions within the VA.

109.     On November 10, 2021, after being notified of the AIB, Stapley's Administrative Officer, Joel Murphy, contacted plaintiff asking to "chat." In the conversation that followed, Murphy directed plaintiff to put in a fiscal ticket to get BF's overtime cap overridden. Plaintiff was incensed and said, "How? You were on the call when Todd told us she wasn't logging on to her computer, and that this was criminal, and that the OIG needed to investigate," and refused. Murphy speculated that maybe there wasn't enough evidence against BF.

110.     The only way plaintiff could override BF's cap would be to certify the overtime work he commissioned her to do was related to COVID, which it was not. BF was processing delegation of authority Community Care consults per the Mission Act. None of the overtime BF had collected already at that point was coded as COVID-related.

111.     On November 23, 2021, BF contacted plaintiff to say she wanted to be back in his service.

112.     On December 6, 2021, Stapley contacted plaintiff about certain Recreational Therapists who reported to plaintiff that Stapley was investigating. This was very out-of-the-ordinary and inappropriately interfered with plaintiff's work. Stapley directed plaintiff to discipline the Recreational Therapists (on appearance because they filed an EEO complaint) by issuing a "standard work product."

15

113.     On December 8, 2021, plaintiff learned through unofficial channels that the Chief of Community Care, CV, abruptly left the position without the usual protocol just as the AIB was getting started.

114.     On December 8, 2021, the Chief of Quality Management at VA Maine reported to Davis during a leadership forum that employees of VA Maine who signed up for overtime shifts to work COVID-related checkpoints were not showing up, unbeknownst to their supervisors who were approving their overtime. The scale of this problem was unknown but likely substantial, she said. Davis stated that an audit needed to occur. Upon information and belief, an audit did not occur.

115.     On December 13, 2021, unbeknownst to plaintiff, Stapley knowingly created and signed the false waiver that deemed BF's "criminal" activity "mission essential" to override the cap and authorize payment of her false claims. (Exhibit A)

116.     On December 16, 2021, around noon, plaintiff's scheduled appearance to testify was postponed by the AIB.

117.     On December 16, 2021, at 2:22 pm, unbeknownst to plaintiff, Davis knowingly signed the false waiver that deemed BF's "criminal" activity "mission essential" to override the cap and authorize payment or approval of her false claims.

118.     On December 17, 2021, plaintiff was informed by the VA Maine Employee & Labor Relations Specialist that Stapley's directive to issue Recreation Therapists a "stand work product" on December 6th was inappropriate and could be interpreted as retaliation.

119.     Between December 27 – 31, 2021, while plaintiff was away from work, Davis had her acting strategic planner "shadow" the Recreation Therapists, which was very unusual

since they reported to the plaintiff, and he was not notified. It appeared to be another fishing expedition to find "dirt" and cause upheaval in plaintiff's service.

120.     On January 10, 2022, the president of the union, CB, contacted plaintiff directly and demanded he provide annual leave documentation within 24 hours – another highly unusual situation – that plaintiff provided within 5 minutes.

121.     On January 11, 2022, plaintiff provided sworn testimony to the AIB.

122.     On January 13, 2022, Stapley texted plaintiff saying he "heard through some channels" (i.e., the union) that plaintiff wasn't following the annual leave plan, and if that was true, to "please do so."

123.     At all times plaintiff followed the annual leave plan.

124.     On February 10, 2022, for the second time, Stapley warned plaintiff about excessive overtime of an employee who was not in his service.

125.     On February 11, 2022, plaintiff sent a memo to the AIB supplementing his testimony because he began to feel harassed by Stapley.  In the memo plaintiff wrote, among other things, "when Dr. Stapley told me that Ms. Fisher was fraudulent in her reporting of her overtime hours, I was mortified and sickened. But he told me there would be an OIG investigation, and I felt better that it would be investigated. Two months later he told me that the AIB would investigate it."

126.     On February 16, 2022, plaintiff had an off-the-rails meeting with Stapley that was scheduled for 30 minutes and lasted 90. Stapley discussed his investigation of the Recreation Therapists. He ranted about the AIB and told plaintiff he needed to "protect" himself. Stapley told plaintiff he knew the details of the AIB, and that plaintiff had a "problem" and that "you do not understand what is going to happen to you." Stapley told

plaintiff he could speak to no one about the meeting. Stapley warned plaintiff, "an AIB is how we reorganized Mental Health." Stapley told plaintiff that 2 OIT people confirmed BF's fraud but because there was no secondary approver for the overtime, plaintiff had "a problem."

127.     In fact, plaintiff had complied with all timekeeping and financial policies at VA Maine and had documentation from BF about her claims for overtime and reports showing the consults had been completed.

128.     The "problem" according to defendants' own investigation was that BF completed the PT consults during her regular work hours and fraudulently claimed the work was done on overtime.

129.     Plaintiff felt threatened and confused by the meeting on February 16, 2022. He believed Stapley wanted him to leave his job.

130.     On February 23, 2022, plaintiff had another meeting with Stapley, followed by a highly inaccurate recapitulation thereof emailed to him on February 25, 2022. For instance, the discussion on February 23, 2022, went on at length about BF's fraud and the claims not being COVID-related in any event.

131.     On March 3, 2022, plaintiff was contacted by BF's supervisor, SH, asking him if BF was still doing PT Community Care consults by designation of authority. It surprised plaintiff that BF was still employed and apparently unsupervised.

132.     On March 4, 2022, plaintiff reported to the VA Inspector General overtime fraud by BF, and fraud, abuse of authority and retaliation by Davis and Stapley. Plaintiff did not choose to have his identity confidential.

133.     On March 8, 2022, unbeknownst to plaintiff, his position was changed in the personnel records.

134.     On March 9, 2022, Stapley issued a Reprimand to plaintiff for failing to follow policy and insufficient oversight of premium pay – the only one of nine recommended actions of the AIB that defendants took.

135.     On March 10, 2022, plaintiff asked for the AIB evidence file.

136.     On March 11, 2022, plaintiff met online with Stapley to review the Reprimand. During the meeting, among other things, Stapley said about BF and her fraudulent claims of $95,000, "it's a LOT of money...and nobody had a clear idea what she was doing during her daytime job." Plaintiff said the Reprimand was a "tough pill to swallow" for a lot of legitimate reasons, but that he understood. Stapley told plaintiff the Reprimand would be put in his file but not impact his career. The Reprimand was not put in plaintiff's file. Plaintiff recorded the meeting using his phone.

137.     On March 18, 2022, plaintiff responded to the Reprimand with an informal grievance, requesting it be absolved because there is no evidence that he violated policy and he should not be held accountable for systemic process issues in VATAS (the time keeping program) and Community Care.

138.     On March 28, the Department of Veterans Affairs Office of the Inspector General issued a letter addressed to plaintiff stating it reviewed plaintiff's allegations regarding a cover up for fraudulent authorization of overtime, conducted a review and determined that further review by the OIG was not appropriate.

139.     On March 28, 2022, Stapley met with plaintiff online in the afternoon to issue a Response to Informal Grievance he had signed at 1:56 pm. Plaintiff recorded the meeting

using his phone. Stapley shared his computer screen with plaintiff to show the overwhelming evidence gathered by Parrish of BF's alleged fraud. According to Stapley, it demonstrated BF performed the PT Community Care consults during her regular job hours and claimed overtime.

140.     Among other things during the meeting on March 28th, plaintiff said, "I don't know what happened with the biweekly cap. We weren't coding her for COVID," to which Stapley said, falsely, "I don't know...yeah, I don't know what happened with that."

141.      Stapley also said during the meeting on 3/28/22, "you have to verify – we have to be sure what we are signing – what we are approving" and agreed that what BF did was a "serious crime" and that she "started complaining to the union about overtime she was fraudulently asking for" and that there were "other things going on with other people I can't talk about" and "sorry it's got to be you."

142.     During the March 28th meeting, Stapley outlined what the expectations were for documenting overtime – steps that plaintiff had in fact taken – and said the AIB did not have the emails BF sent to timekeepers almost daily about the overtime hours she claimed to work. Stapley described the AIB process as purposely narrowly tailored to achieve an outcome, and that regarding BF, "the issue isn't finished" but he could not discuss it.

143.     Beginning in April 2022 through present, plaintiff's role in managing the pool used for therapy was substantially reduced for unexplained and unjustified reasons. Defendants bypassed him on public relations issues that he normally dealt with and used an atypical method of filling a position to replace him.

144.     On April 14, 2022, Stapley informed plaintiff without explanation that Recreation Therapists were being realigned from his service.

145.     On April 22, 2022, plaintiff filed a formal grievance of the Reprimand with Davis.

146.     Sometime between April 26 – 29, 2022, CV, the former Chief of Community Care, reappeared without explanation, having avoided the AIB all together even though BF's overtime was directly related to Community Care.

147.     On May 2, 2022, at 7:49 am plaintiff was informed that Davis had assigned the formal grievance of the Reprimand to Tyler Watson, who would serve as both the grievance examiner and deciding official.

148.     On May 2, 2022, at 3:37 Tyler Watson issued his decision, not sustaining the Reprimand's specification that plaintiff violated policy, but sustaining the finding of insufficient oversight.

149.     On May 3, 2022, Davis through her agent informed plaintiff he had no more rights to appeal the Reprimand.

150.     On May 10, 2022, without explanation, plaintiff was demoted on the organizational chart circulated to all VA Maine Service Chiefs. Instead of reporting to the Chief of Staff, Stapley, he was shown to report to the Assistant Chief of Staff.

151.     On May 31, 2022, Stapley sent an email to all the Service Chiefs including plaintiff with a spreadsheet of employees who were paid substantial overtime in FY 2022 as of that date – more than 30% of their annual salary totaling roughly half a million dollars – and for the 3rd time wrongly identified Charity Brann as plaintiff's employee. None of the 31 employees on the spreadsheet showing excessive overtime were in plaintiff's service. The email provided no guidance or instructions.

152.     Upon information and belief, plaintiff is the only person at VA Maine whose been reprimanded for insufficient oversight of overtime during this time.

153.     The highest earner of excessive overtime was in the executive office.

154.     On June 2, 2022, plaintiff saw for the first time – in a response received to a FOIA request by counsel - that Stapley and Davis had signed the false waiver of BF's overtime deeming it "mission essential" to COVID -- contrary to what Stapley told him in the March 28th meeting. ("yeah, I don't know what happened with that.")

155.     On June 27, 2022, plaintiff learned an employee in his service was authorized by Davis to earn comp time, the equivalent of overtime, to attend Pride events the week before. Supervisors were not notified in advance - allegedly one the bases of plaintiff's reprimand.

156.     On June 30, 2022, Davis announced at the Morning Report that Community Care spending had reached 34% of the VA Maine operating budget.

157.     According to the VA Central Office, any of its healthcare systems that spend more than one-third of its operating budget on Community Care renders it "non-viable."

158.     On June 30, 2022, plaintiff ran in to BF coming out of a stairwell at VA Maine in the afternoon. BF did not acknowledge plaintiff and avoided eye contact.

159.     On July 19, 2022, Stapley said during an emergency meeting of the VA Maine executive leadership team about granting unvaccinated staff accommodations to continue working, that in regard to BF, it was a moot point because she would be moving on soon.

160.     In November 2022, the union president emailed plaintiff demanding copies of all email correspondence with BF pertaining to the assignment of overtime. In a phone conversation that followed, the union president offered without solicitation information

about his close relationship with Davis that made plaintiff feel uncomfortable, and that he was working on an action against two other people he assumed plaintiff knew. Plaintiff had no idea what he was talking about.

161.     On December 4, 2022, without notice to plaintiff, Davis demoted a troubled supervisor who had inappropriate sexual relationships with subordinates and overtime issues, WM, to fill a vacant position in plaintiff's service. WM was not qualified to perform the position. When he asked for an explanation, plaintiff was told this was the only suitable position available for WM, which was false. There was approximately a dozen other positions WM could have filled. This was punishment.

162.     On or about January 1, 2023, unbeknownst to plaintiff, defendants altered his employment records for the purpose of increasing his threat risk and instigating an unwarranted investigation, among other things, and to intimidate him.

163.     On March 2, 2023, plaintiff was notified that his job was "High Risk" and that he must undergo an extensive investigation.  At the time, plaintiff had been in the same position for 11 years and it was always rated "Moderate Risk." Persons conducting the investigation were perplexed why plaintiff was before them and commented about it being unusual.

164.     On March 20, 2023, plaintiff was contacted by the Credentialing and Privileging office asking for BF's professional evaluations from 2018 – 2020. He was told the reason they were needed was "to retire her file," something in his experience had never occurred before.

## JURISDICTION AND VENUE

165.    This Court has original jurisdiction under 28 U.S.C. §1331, 31 U.S.C. § 3730(h)(2) and 5 U.S.C §2302. Venue is appropriate because all matters arose in this District and all parties reside here.

## DEMAND FOR JURY TRIAL

166.    Plaintiff demands a trial by jury of all claims to the extent allowed by law.

## COUNT ONE
## RETALIATION IN VIOLATION OF 31 USCS § 3730(h)

167.    Plaintiff was demoted, threatened, harassed, and in other manners discriminated against in the terms and conditions of his employment by defendants because he refused to approve a false claim to override BF's cap so she would be paid $95,000 in overtime she was not owed, refused to falsely characterize BF's work doing PT consults to Community Care as COVID-related, and engaged in protected activity and other lawful acts described above in furtherance of efforts to disclose and stop false claims against the United States.

168.    Defendants' wrongful acts caused plaintiff substantial harm including loss of duties and privileges of his job, loss of enjoyment of life, pain and suffering, fear, embarrassment, injury to professional reputation, legal fees and expenses.

169.    Plaintiff is entitled to all relief necessary to make him whole including reinstatement of his title, chain of command, duties and responsibilities, and special damages including litigation costs and reasonable attorney's fees.

## COUNT TWO
## FALSE CLAIM AND CONSPIRACY 31 U.S.C. §3729(a)(1)(A -C)

170.     Defendants Davis and Stapley, acting outside their official capacity, and conspired with each other and the union to commit a violation of the False Claim Act when they knowingly agreed to cause to be presented a false or fraudulent claim for payment or approval of BF's false overtime claims.

171.     Defendants Davis and Stapley, acting outside their official capacity, conspired with each other and the union to commit a violation of the False Claim Act when they knowingly made, used, or caused to be made a false record or statement material to a false or fraudulent claim when they agreed to code BF's overtime as "mission essential" to avoid the cap and a labor dispute.

172.     Defendants Davis and Stapley, acting outside their official capacity, conspired with each other and the union to commit a violation of the False Claim Act and abused their authority when they knowingly agreed to use an AIB process to whitewash malfeasance.

173.     Defendants Davis and Stapley, acting outside their official capacity, conspired with each other and the union to commit a violation of the False Claim Act and abused their authority when they knowingly determined in advance that, "sorry it's got to be plaintiff" who would take one for the team because he wouldn't play ball and put in a fiscal ticket letting BF off the hook and reported to the OIG their fraud.

174.     Davis, Stapley and the union shared a concerted agenda - to avoid scrutiny of overtime, Community Care and COVID spending at VA Maine while federal regulators were in house – and dictate the outcome of a labor dispute without invoking the process set forth in the labor contract. The union did not want a light

25

shined on its members' explosive, questionable overtime -- and defendants wanted their questionable oversight kept in house.

175. Defendants Davis and Stapley's conspiracy with each other and/or the union to violate the False Claim Act and otherwise abuse their authority caused substantial harm to the United States including the fraudulent payment to BF for $95,000 and, upon information and belief, substantially more in COVID-related overtime fraud

176. Defendants are liable for civil penalties, damages, reasonable attorney's fees and expenses, and such other relief the court deems just.

**COUNT THREE**
**WHISTLEBLOWER PROTECTION ACT (WPA)**
**5 U.S.C. § 2302(B)(8) AND (9)**

177. Defendants committed a prohibited personnel practice under § 2302(b)(8) of the WPA when they threatened to take and took a personnel action(s) against plaintiff because he disclosed what he reasonably believed was a violation of the law, gross mismanagement of funds and abuse of authority as described herein.

178. Defendants committed a prohibited personnel practice under § 2302(b)(9)(C) of the WPA when they threatened to take and took a personnel action(s) against him for disclosing information to the Inspector General and others in accordance with law.

179. Defendants committed a prohibited personnel practice under § 2302(b)(9)(D) because plaintiff refused to obey an order that would require him to violate the law, rule, or regulation.

180. Defendants prohibited personnel actions caused plaintiff damages, including alteration of his title, downgrading his chain of command, reducing substantially his duties, responsibilities, and privileges of the job, reducing the number of employees

he supervises, public embarrassment, loss of enjoyment of life, damage to

professional reputation, pain and suffering, inconvenience, and litigation expenses.

**WHEREFORE**, plaintiff seeks justice, judgment in his favor, all available civil remedies

including penalties, money damages, interest, costs, attorney's fees, injunctive relief, and

all other relief this honorable court deems just and appropriate.

Dated: August 24, 2023                   /s/ Cynthia A Dill
                                        Cynthia A. Dill, Esq.
                                        Attorney for Relator/Plaintiff Erik K. Sargent
                                        Bar No. 007055

LAW OFFICE OF CYNTHIA A. DILL
511 Congress Street
Portland, Maine 04101
(207) 749-7749
cynthia@dillesquire.com